*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v

JOHN MACAULEY BURKMAN,

       Defendant-Appellant.

FOR PUBLICATION
June 2, 2022
9:10 a.m.

No. 356600
Wayne Circuit Court
LC No. 20-004636-01-FH

---

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v

JACOB ALEXANDER WOHL,

       Defendant-Appellant.

No. 356602
Wayne Circuit Court
LC No. 20-004637-01-FH

---

Before: LETICA, P.J., and REDFORD and RICK, JJ.

LETICA, P.J.

In these consolidated appeals,[1] defendants, John Macauley Burkman and Jacob Alexander Wohl, appeal as on leave granted[2] the trial court's orders denying their motions to quash and

---

[1] *People v Burkman*, unpublished order of the Court of Appeals, entered November 9, 2021 (Docket Nos. 356600 and 356602).

[2] This Court denied defendants' applications for leave to appeal, *People v Burkman*, unpublished order of the Court of Appeals, entered May 6, 2021 (Docket No. 356600), *People v Wohl*, unpublished order of the Court of Appeals, entered May 6, 2021 (Docket No. 356602), but the Supreme Court remanded to this Court for consideration as on leave granted, *People v Burkman*,

-1-

dismiss. Defendants were both charged with attempting to influence, deter, or interrupt electors, MCL 168.932(a), conspiracy to commit that offense, MCL 750.157a, and two counts of using a computer to commit a crime, MCL 752.796.

Defendants contend that the charges should have been dismissed because their dissemination of a robocall regarding possible repercussions of mail-in voting did not constitute a menace or use of other corrupt means or device under MCL 168.932(a). We conclude the robocall did involve menace and could also be construed as a corrupt means or device. Defendants further contend that MCL 168.932(a) is unconstitutional both on its face and as applied in this case. However, the phrase "other corrupt means or device" is not unconstitutionally vague. Concerning defendants' First Amendment arguments, the robocall message was not a "true threat," but is still not subject to First Amendment protections because it was speech integral to criminal conduct. Accordingly, we affirm.

## I. BASIC FACTS AND PROCEDURAL HISTORY

Derrick Thomas was a retired firefighter, resident of the city of Detroit, and registered voter. As a regular voter, Thomas received "robocalls;" a prerecorded phone message disseminated to a large group of people via a computer or robot. Thomas had telephone service through both a landline at his home and a cell phone. Thomas had placed himself on a do-not-call list several times, but it did not stop unsolicited calls to his home.[3] His landline phone had a (313) area code, a caller identification feature, and the ability to simultaneously record a message and play it aloud as it was recorded. On August 26, 2020, at 11:16 a.m., Thomas did not answer a phone call to his landline from phone number (703) 795-5364, a number he did not recognize. Still, he heard the message that was left as it was recorded:

> Hi, this is Tamika Taylor from Project 1599,[4] a civil rights organization founded by Jack Burkman and Jacob Wohl. Mail-in voting sounds great, but did you know

---

___ Mich ___ (2021) (Docket No. 163164), *People v Wohl*, ___ Mich ___ (2021) (Docket No. 163165). We refer to "defendants" to reflect collective action, but refer to each defendant by his last name where appropriate to reflect individual activity.

[3] According to the FCC, "Political campaign-related autodialed or prerecorded voice calls, including autodialed live calls, autodialed texts, and prerecorded voice messages, are prohibited to cell phones, pagers, or other mobile devices without the called party's prior express consent." However, "[p]olitical campaign-related autodialed or prerecorded voice calls are permitted when made to landline telephones, even without prior express consent." FCC, Rules for Political Campaign Calls and Texts <https://www.fcc.gov/rules-political-campaign-calls-and-texts> (accessed May 31, 2022).

[4] According to the Federal Communications Commission (FCC), Project-1599 is not a registered legal entity, but a branding name used to describe the activities conducted by defendants and J.M. Burkman & Associates, LLC, an entity providing registered lobbying services. <https://www.fcc.gov/document/fcc-proposes-5-million-fine-unlawful-robocalls> (accessed May 31, 2022). Although the FCC proposed a forfeiture of $5,134,500 against defendants and the

that if you vote by mail your personal information will be part of a public database that will be used by police departments to track down old warrants and be used by credit card companies to collect outstanding debts? The [Center for Disease Control and Prevention (CDC)] is even pushing to use records from mail-in voting to track people for mandatory vaccines. Don't be finessed into giving your private information to the man. Stay safe and beware of vote by mail.

The message upset Thomas as he believed it was designed to act as "a deterrent from mail-in voting." Although Thomas did not believe that his direct physical safety was threatened, indirectly, he felt concerned about his safety because politics were polarizing. Thomas found the message offensive because it indicated that voting information would be used to allow the police to determine if an individual had any bench warrants, allow credit card companies to learn if an individual had any outstanding debts, and allow the CDC to force an individual to get vaccinated. Thomas felt appalled more than threatened by the message because it deterred mail-in voting during a pandemic and voting in-person was not as safe.

Thomas tried to notify the Detroit Election Commission about the phone call and message, but was unable to speak to a person. Thomas then called a local news radio station, and he was interviewed for a story. He played the recorded message for the station employee and gave consent to have the radio station record the message.

As a result of the radio interview, Thomas was contacted by the Department of Attorney General. Thomas did not have firsthand knowledge about any truth to the contents of the message. He did not allow himself to be affected by the message and voted by mail.

The Department assigned Jeffrey Campbell the task of investigating the robocall. Campbell learned that the robocall was sent by a company called Message Communications operated by Robert Mahanian. Additionally, the investigation determined that defendants paid to have the robocall sent by Mahanian's company and were responsible for the robocall's content. Through search warrants, Campbell obtained e-mail exchanges between defendants, and because of the volume of the e-mails, Campbell had not yet reviewed all of them. In the e-mails Campbell had read, defendants discussed how to "hijack" this "boring" election. On August 19, 2020, Burkman wrote to Mahanian and copied Wohl that the checks were sent in a "two[-]day pouch" and "then we attack." On August 22, 2020, defendants communicated to Mahanian that they were ready to begin the robocalls and that the payment had been mailed.

On August 25, 2020, Wohl e-mailed Burkman that the audio file of the robocall was attached. Wohl further suggested that the robocall be sent "to black neighborhoods in Milwaukee, Detroit, Philadelphia, Charlotte, Richmond, Atlanta, and Cleveland." In response, Burkman suggested that the robocall be sent to "Cleveland, Philadelphia, Minnesota, Chicago, New York

---

lobbying entity, the basis of the fine was the unlawful robocalls to wireless numbers without subscribers' prior express consent. For this reason, the content of the robocall was irrelevant to the proposed forfeiture. *Id*. at 1-2 n 10.

City, and Detroit." It was determined that the robocalls would be sent in "two waves" consisting of 267,000 calls in each wave.

On August 26, 2020, Mahanian notified defendants that their "campaign is currently running and recording." Defendants exchanged e-mails that the robocalls were being discussed on the Twitter platform. On August 26, 2020, at 12:36 p.m., Burkman wrote to Wohl to comment on the success of the robocalls, stating, "I love these robo[]calls getting angry black call backs, win or lose, the black robo[]calls was [sic] a great idea."

On August 27, 2020, Wohl seemingly wrote Burkman that they should deny sending the robocalls because it would generate more written discussion. Indeed, in response to a writer from a political news and opinion website, Burkman wrote, "[W]e have no connection to those robo[]calls." A short time later, Burkman addressed the same writer, stating:

> [C]ouple points, one, no one in their right mind would put their cell [phone number] on [the] robo[]call. I bet a [George] Soros Group is trying to embarrass us. Thirdly, we have been asked by the Trump Campaign to do robo[]calls and politely declined. We don't do that stuff.

Additionally, a member of the Associated Press wrote Burkman and asked if defendants were involved in the robocall. Burkman wrote back, "[N]o sir, not at all." However, on October 26, 2020, Burkman presented at a federal court hearing in New York and acknowledged that defendants prepared and caused the robocall message to be sent. At the same hearing, Wohl affirmed the statement made by Burkman.[5]

Campbell was asked by Burkman's counsel whether there was other evidence his client desired to deter mail-in voting. Although Campbell had not completed his review of the e-mails, he responded there were "e[-]mails between [defendants] discussing other plans to influence the election by creating false schemes, hiring actors to create false allegations and so forth." When asked to provide an opinion regarding the nature of the e-mail between defendants, Campbell responded, "one of their intentions [was] to influence the election unfairly" and to deter mail-in voting. He acknowledged that the e-mails did not reference in-person voting.

During Campbell's investigation, he learned that defendants uploaded the content of the robocall. Furthermore, defendants, not Mahanian, chose the *zip codes* where the robocall was deployed. Campbell had no evidence that Mahanian altered the content of the robocall presented by defendants, and Mahanian kept detailed records addressing client involvement and content history.

Khyla Craine, an attorney, served as the second in command of the legal services administration, which included the bureau of elections, within the Secretary of State and provided legal and policy consultations. Craine also was the chief privacy officer and addressed data-related

---

[5] During the preliminary examination, counsel for both defendants inquired whether Campbell interviewed their clients. Campbell testified that he asked to conduct interviews after the charges were issued, but his request was denied.

questions. Craine described a robocall as "[a]n automated [message] dialed to a group of residents that will encourage them to do something, usually tied to election, but it could be for any purpose[.]" Craine was made aware of this particular robocall in late August or early September 2020. There was an accusation "that it would be voter suppression type of robo[]call targeted African American citizens in the City of Detroit." Craine heard the robocall in October 2020.

Craine testified that information related to elections was part of a public record. However, there were search limitations on the record. She opined that the robocall's content addressing law enforcement, credit card agencies, or use by the CDC was false. A state election file contained the voter's name, address, participation in an election, and type of vote cast, mail-in or in-person. This information could be shared publicly. However, state law prohibits the voter's phone number or e-mail address from being shared. Because the qualified voter file contained limited data that did not include contact information, it did not make sense that law enforcement or credit card agencies would use this compiled material. Moreover, there were other compiled databases that law enforcement and credit card agencies used that contained information they required for their work. For example, the driver information file provided companies more details than the qualified voter file. The Law Enforcement Information Network system was the database used by police agencies to achieve their objectives. Craine was unaware of any voting information requested by or given to the CDC, and she was unaware of any mandated vaccinations as stated on the robocall. Even Craine did not have access to the qualified voter files, the access was given on a need-to-know basis, and the recipients that received these files were vetted by the bureau of elections. Thus, Craine opined that law enforcement did not have access to the qualified voter file unless there was an investigation into an elections related offense. Further, it was not used by credit card companies to collect outstanding debts. Thousands of entities request information from the driver files, not the qualified voter files. Craine opined that voters had no reason to be concerned about mail-in voting. And she "would have a concern if [voters] listened to this robo[]call and got misinformation and whether or not . . . they would feel that mail[-]in voting was safe."

On cross-examination, Craine opined that an individual's qualified voter file could not be accessed, but a request for a specific jurisdiction or for every voter could be obtained. Furthermore, if debt collection was the goal, other databases provided more suitable information. Craine affirmed that she was offended by the robocall to the extent the state had the "responsibility . . . to ensure that all of our voters are able to vote without any type of issue and that they're not intimidated or given misinformation about the accuracy or security of their ballot." Also, on cross-examination, Craine again opined that the information contained in the robocall was false. Although Craine did not call the CDC to determine if it would seek to access voter files, there were no mandated vaccinations at that time.

Craine also never sought out defendants to inquire about their reason for the robocall. But, if motivated by concern over mail-in ballots, Craine found it curious that defendants only directed the robocall to Detroit residents rather than cautioning citizens across the State of Michigan about mail-in voting. In Craine's experience addressing voter suppression, the robocall fit into the pattern of misinformation directed to select individuals in a particular jurisdiction. When it was proffered that defendants' purchase of information pertaining to the (313) area code of Wayne County included suburban communities that were "highly Caucasian," Craine maintained that Wayne County remained "disproportionately African-American." Again, Craine testified defendants appeared to target a particular group of people, not just general voters, in light of the

dissemination of the robocall to a limited area and not the entire state. Further, she opined that the use of phrases such as "mandatory vaccinations" and "the man" was verbiage directed to a particular group of people. Because the robocall attempted to deter mail-in voting and COVID-19 had disproportionately affected African-Americans in Detroit, Craine concluded that suppression of the vote was the logical determination in light of the combination of factors. In the 18 months that Craine worked in her position, police, credit card agencies, and the CDC had never used the qualified voter files.

At the conclusion of this testimony, defendants opposed the bindover, alleging that the statute did not govern the message at issue or did not clearly define the conduct it governed and that the message at issue contained speech that was protected by the First Amendment. The prosecution asserted that it presented sufficient information to support the elements and the speech at issue was not protected.

The district court concluded that the crimes alleged were committed in the city of Detroit and that there was probable cause to believe that defendants committed them. The district court noted Craine's testimony that law enforcement, credit card companies, and the CDC did not access the qualified voter files to contact people or to execute their duties. It was also noted that defendants disseminated the call to a particular group of people in light of defendants' "very strong political views," and the appropriate inquiry was not the effect of the message on the recipient, but defendants' intent. The district court also stated that the message was directed to a community that was 85% African-American and this community equated the term "the man" to "the white man."

In the circuit court, defendants moved to quash the bindover. First, defendants argued that MCL 168.932(a) did not criminalize their conduct because they did not engage in acts of physical harm. Second, defendants submitted that MCL 168.932(a) was unconstitutional on its face and as applied and protected by the First Amendment. The prosecution opposed the motion, alleging that defendants' actions were criminal and in violation of MCL 168.932(a) because they sent a threatening message designed to deter individuals from voting, and the threat need not be physical. It was further alleged that the message was not protected by the First Amendment because it was a true threat and there was a need to protect the right to vote.

After hearing oral argument, the trial court rejected defendants' arguments. The trial court concluded that the district court did not abuse its discretion in binding defendants over in light of the content of the message, the e-mails exchanged between defendants regarding their desire to "hijack" the election, the community to which the message was directed, and the circumstances surrounding the pandemic as residents were encouraged to stay home. The trial court also rejected the contention that the prosecution violated defendants' First Amendment rights, noting that the state had a compelling interest in protecting the right to vote and narrowly tailored MCL 168.932 to prevent any attempt to influence the vote or deter a vote. Moreover, the trial court characterized the message as not expressing an opinion, but presenting misleading and possibly false information. From this decision, defendants appeal.

## II. STANDARDS OF REVIEW

A trial court's ruling regarding a motion to quash the information is reviewed for an abuse of discretion. *People v Zitka*, 325 Mich App 38, 43; 922 NW2d 696 (2018). An abuse of discretion occurs when a trial court's decision falls outside the range of reasonable and principled outcomes. *People v Burger*, 331 Mich App 504, 510; 953 NW2d 424 (2020) (citation and quotation omitted). A trial court necessarily abuses its discretion when it commits an error of law. *Id*. The bindover decision is reviewed de novo to determine whether the district court abused its discretion without any deference to the circuit court decision. *People v Hawkins*, ___ Mich App ___, ___; ___ NW2d ___ (2022) (Docket No. 357068), slip op at 8. Similarly, the denial of a defendant's motion to dismiss charges is reviewed for an abuse of discretion. *People v Korkigian*, 334 Mich App 481, 489; 965 NW2d 222 (2020). To determine whether dismissal is appropriate for the failure to demonstrate the defendant's intent, the facts and circumstances or context of where and when defendant's conduct took place may be considered. *People v Gerhard*, ___ Mich App ___, ___; ___ NW2d ___ (2021) (Docket No. 354369), slip op at p 7; *People v Byczek*, ___ Mich App ___, ___; ___ NW2d ___ (2021) (Docket No. 350341), slip op at p 8.

Issues involving statutory interpretation are reviewed de novo. *People v Lydic*, 335 Mich App 486, 490; 967 NW2d 847 (2021). The lower court's determination that a defendant's conduct falls within the scope of a penal statute is reviewed de novo. *Korkigian*, 334 Mich App at 489. Further, application of the facts to the law is reviewed de novo. *Lydic*, 335 Mich App at 490. A challenge to the constitutionality of a statute presents a question of law reviewed de novo on appeal. *People v GR*, 331 Mich App 58, 68; 951 NW2d 76 (2020).

## III. APPLICATION OF MCL 168.932

Defendants first assert that their conduct does not constitute a violation of the voter suppression statute. We disagree.

When interpreting a statute, the primary goal is to ascertain and give effect to the intent of the Legislature. *People v Morrison*, 328 Mich App 647, 651; 939 NW2d 728 (2019). If the statutory language is plain and unambiguous, the legislative intent is clearly expressed, and judicial construction is neither permitted nor required. *People v Costner*, 309 Mich App 220, 224; 870 NW2d 582 (2015). When interpreting a statute, the appellate court must give effect to every word, phrase and clause and not render any part of the statute surplusage or nugatory. *People v Rea*, 500 Mich 422, 427-428; 902 NW2d 362 (2017). "When a word or phrase is not defined by the statute in question, it is appropriate to consult dictionary definitions to determine the plain and ordinary meaning of the word or phrase." *Id*. at 428. "In construing a legislative enactment we are not at liberty to choose a construction that implements any rational purpose but, rather, must choose the construction which implements the legislative purpose perceived from the language and the context in which it is used." *People v TJD*, 329 Mich App 671, 688; 944 NW2d 180 (2019) (citation omitted).

## A. MENACE

MCL 168.932 provides, in pertinent part:

A person who violates 1 or more of the following subdivisions is guilty of a felony:

(a) A person shall not attempt, by means of bribery, menace, or other corrupt means or device, either directly or indirectly, to influence an elector in giving his or her vote, or to deter the elector from, or interrupt the elector in giving his or her vote at any election held in this state.

Defendants contend that the robocall was not menacing because it did not involve a threat of physical assault. Because the term "menace" is not defined in MCL 168.932, we may consult a dictionary definition to determine the plain and ordinary meaning of the word. *Rea*, 500 Mich at 428. "Menace" is defined as "a show of intention to inflict harm"; "one that represents a threat"; "to make a show of intention to harm"; or "to represent or pose a threat to." *Merriam Webster's Collegiate Dictionary* (11th ed). The term "menace" as defined in the dictionary does not require an accompanying physical component, but may be established through a threat. Indeed, the plain language of MCL 168.932(a) does not require that the menace be achieved through physical contact as reflected by the Legislature's further qualification that a person shall not attempt by menace, either *directly or indirectly*, to deter the elector from giving his vote. Thus, the behavior equated with menace may occur either directly or indirectly. The term "directly" is defined as "in a direct manner"; "in immediate physical contact"; and "in the manner of direct variation." *Id*. Further, the term "indirectly" is defined as "deviating from a direct line or course"; "not straightforward and open"; and "not directly aimed at or achieved." *Id*. By the Legislature's allowance for the menace to occur in a direct or indirect manner, the menace may be achieved with or without physical contact. This challenge is without merit.

Nonetheless, defendants posit that the term "menace" has acquired a peculiar meaning in the law requiring physical harm, and because the robocall did not threaten physical harm, the motion to quash should be granted. Defendants' citation to criminal cases involving an assault are not persuasive.[6] There is no indication that the Legislature intended to limit the term "menace" as applied in cases charging criminal assault to this election statute. Further, the interpretation urged by defendants is contrary to the rules governing statutory construction. We are to apply the term "menace" according to the legislative intent as expressed by the statutory language of the election law statute. *Costner*, 309 Mich App at 225. Thus, the term must be examined in the context in which it is used *in election law* to implement the legislative purpose as expressed by the plain language. *TJD*, 329 Mich App at 688. MCL 168.932(a) criminalized the interference with the exercise of the right to vote as well as a breach of the integrity of the process through interference, i.e., the interruption of the elector in giving his vote. The requirement of a physical component underlying the term "menace" in MCL 168.932(a) when the menace may occur directly or indirectly is contrary to the legislative purpose and intent as expressed in the statute's plain language. Accordingly, we decline defendants' invitation to read a physical component into the voter suppression statute, MCL 168.932(a).

---

[6] Moreover, the cases cited by defendants did not examine the precise meaning of menace. See *People v Johnson*, 407 Mich 196, 241; 284 NW2d 718 (1979) (LEVIN, J., dissenting); *People v Doud*, 223 Mich 120, 123; 193 NW 884 (1923); *Hamlin v Mack*, 33 Mich 103, 106 (1875); *People v Plumsted*, 2 Mich 465, 466 (1853).

## B. CORRUPT MEANS OR DEVICE

Alternatively, defendants assert that the robocall message did not constitute a "corrupt means or device" because it was not intrinsically unlawful like bribery or menace.[7] We disagree.

Specifically, invoking the statutory canon of construction *noscitur a sociis*, a doctrine that "stands for the principle that a word or phrase is given meaning by its context or setting," *People v Morris*, 314 Mich App 399, 410; 886 NW2d 910 (2016), defendants submit that "corrupt means or device" must be interpreted by reference to bribery and menace. Indeed, words in a statute should not be examined in a void, but should be read as a whole to harmonize the meaning and give effect to the whole act. *People v Hill*, 486 Mich 658, 668; 786 NW2d 601 (2010) (citation omitted). Applying *noscitur a sociis*, words and clauses are not detached from those which precede and those that follow. *Id.* Although the meaning of grouped words should be given a related meaning, that does not require that the terms be subsumed or contrived to fall within the same definition. Rather, "it is clear that what a court should do in construing a term in a criminal statute for which there are a variety of potential definitions is to determine from among those definitions which the Legislature most reasonably intended by the specific context in which the term is found." *Id.*

We decline the request to apply *noscitur a sociis* in order to achieve defendants' goal of equating "corrupt means or device" with menace or bribery. To do so, we would fail to give effect to every word, phrase and clause in MCL 168.932(a) and render "corrupt means or device" surplusage or nugatory. *Rea*, 500 Mich at 427-428. Further, there is no need to resort to such legal maxims, as this Court has previously explained in the context of misconduct in office that "corrupt behavior" refers to "intentional, purposeful, deliberate, and knowing wrongful behavior." *People v Waterstone*, 296 Mich App 121, 138; 818 NW2d 432 (2012). Our Supreme Court has likewise described "corrupt intent" as a "sense of depravity, perversion or taint." *People v Perkins*, 468 Mich 448, 456; 662 NW2d 727 (2003). Additionally, both lay and legal dictionaries provide similar definitions of corrupt. See *Merriam Webster's Collegiate Dictionary* (11th ed) ("morally degenerate and perverted," "characterized by improper conduct (as bribery or the selling of favors)"; *Black's Law Dictionary* (11th ed) ("[h]aving unlawful *or* depraved motives; given to dishonest practices, such as bribery") (emphasis added).

The evidence at the preliminary examination was sufficient to bind over defendants premised on "other corrupt means or device." The prosecution introduced e-mails exchanged between defendants in which they discussed "hi-jack[ing] this boring election." In order to achieve this goal, defendants composed a robocall message stating that mail-in voting "will" allow personal information to become part of a public database. It was then concluded that *this* database "will be used by police departments to track down old warrants and be used by credit card companies to collect outstanding debts?" Further, the robocall posited that the CDC was "pushing"

---

[7] In the discussion of this issue addressing the statute's terms, defendants raise a number of hypothetical circumstances. Because these hypotheticals were raised in the context of a statutory construction challenge and not First Amendment freedoms, we must focus on the specifics of the case at hand. *People v Lockett*, 295 Mich App 165, 176; 814 NW2d 295 (2012).

to use mail-in voting records to "track people for mandatory vaccines." Defendants then arranged to send the robocall message to predominantly African-American metropolitan neighborhoods[8] and expressed pleasure when they received "angry black call backs." When defendants were contacted about their participation in the robocall, they initially denied any involvement. Months later, during a separate court proceeding in another state, defendants admitted they were responsible for disseminating the robocall message. Craine opined that the robocall statements were false because the qualified voter files had never been used in the manner suggested by the robocall, nor would it be practical for law enforcement, creditors, or the CDC to use qualified voter files when other publicly available databases provided more personal details. Further, she noted that the vaccinations were not mandatory at the time of the robocall. Thomas, a voter who received the robocall, construed it as trying to deter listeners from mail-in voting and opined that many people may not want to vote at all if they felt in-person voting during the COVID-19 pandemic was their only option. In light of the content of the robocall and the pandemic, a voter, contingent on his or her circumstances, may deem it ill-advised or unsafe to exercise the right to vote either through mail-in or in-person voting. A fact-finder could conclude from this evidence that defendants intentionally disseminated a dishonest message with the depraved motive of deterring voting. *Gerhard*, ___ Mich App at ___, slip op at p 7; *Byczek*, ___ Mich App at ___; slip op at p 8. Consequently, the trial court did not abuse its discretion by denying defendants' motion to quash because there was probable cause to believe that defendants used a corrupt means or device to deter voting, MCL 168.932(a), in light of all the facts and circumstances. *Zitka*, 325 Mich App at 43.

Defendants also argue that the bindover should have been quashed because MCL 168.932(a) prohibits influencing, deterring, or interrupting an elector from "giving his or her vote," and the robocall message only deterred one specific method of voting—mail-in voting— without discouraging traditional in-person voting. But as the prosecution points out in response, the timing of the robocall was significant. Our nation was in the midst of the COVID-19 pandemic, such that in-person voting carried with it a serious risk to a voter's health. The message could also deter all voting by robocall recipients who were entirely unable to vote in-person for reasons other than the risk of contracting or spreading COVID-19. Thus, whether defendants influenced, deterred, or interrupted electors from giving their votes under these circumstances is a question of fact. *Gerhard*, ___ Mich App at ___, slip op at p 7; *Byczek*, ___ Mich App at ___; slip op at p 8.[9]

---

[8] Campbell testified that he learned the robocall was disseminated by zip code, but did not specify the zip codes on the record. Thomas testified that he received the robocall to his landline in his Detroit residence which was a (313) area code. During the questioning of Craine, defense counsel referenced that defendants purchased information pertinent to the (313) area code in Wayne County. From the record, it is unclear if defendants purchased the qualified voter files of metro Detroiters or some other database and then directed the robocall to specific zip codes premised on race or other factors in light of the data purchased.

[9] Defendants also contend that there was no evidence that a voter was dissuaded from voting as a result of the robocall. Indeed, Thomas testified that he was appalled by the robocall's message, but it did not deter him from voting. The clear and plainly expressed language of MCL 168.932(a),

Defendants contend that the robocall message cannot lead to criminal liability under MCL 168.932(a) because the message asserted opinion, plausibly true facts, or untrue facts defendants did not know to be false. As noted, MCL 168.932 provides, in pertinent part:

> A person who violates 1 or more of the following subdivisions is guilty of a felony:
>
> (a) A person shall not attempt, by means of bribery, menace, or other corrupt means or device, either directly or indirectly, to influence an elector in giving his or her vote, or to deter the elector from, or interrupt the elector in giving his or her vote at any election held in this state.

Defendant's arguments address the intent required by MCL 168.932(a). As noted, for the robocall to be deemed a corrupt means or device, it must be established that defendants deliberately used a wrongful method with a depraved intent to interfere with voting. Regardless of whether the message was worded in the form of an opinion, possibly true,[10] or unknowingly false, if defendants intended to influence, deter, or interrupt an elector in giving his or her vote, MCL 168.932(a) is satisfied. The prosecution presented sufficient evidence to establish probable cause that defendants had the requisite intent, and the trial court did not abuse its discretion by denying defendants' motion to quash the bindover.

Lastly, defendants submit that this Court should apply the rule of lenity because the definition of "other corrupt means or device" is ambiguous. "The rule of lenity provides that courts should mitigate punishment when the punishment in a criminal statute is unclear." *People v Johnson*, 302 Mich App 450, 462; 838 NW2d 889 (2013) (quotation marks and citation omitted). Stated otherwise, "[t]he rule of lenity stands for the proposition that penal laws are to be strictly construed with all doubts resolved in a defendant's favor[,]" and "[t]he rule applies only when the statutory text is ambiguous[.]" *People v Arnold*, ___ Mich ___, ___; ___ NW2d ___ (2021) (Docket No. 160046), slip op at p 19 n 51 (citations omitted). Because MCL 168.932(a) is not

---

*Costner*, 309 Mich App at 224, prohibits the "*attempt*, by means of . . . menace, or other corrupt means or device, either directly or indirectly, to influence . . . or deter . . . or interrupt the elector in giving his or her vote at any election held in this state." (Emphasis added). Thus, the plain language punishes, as a felony, the attempt and there is no further requirement that the attempt be successful to punish the conduct.

[10] Defendants contend that the content of the robocall was plausibly true because law enforcement and credit card agencies use other databases in the course of their work. However, the robocall's message did not convey that other databases afforded those entities the information created by mail-in voting or that qualified voter files were subject to dissemination. Rather, defendants' robocall message correlated mail-in voting to the creation of information leading to the possible execution of a bench warrant, adverse consequences from a credit card debtor, and possible mandated vaccination. The implication being, that by mail-in voting, the voter would cause unintended or unwanted consequences. That is, by mail-in voting, the voter would essentially cause their undoing. The message, its truth or falsity, and its implications as applied to MCL 168.932(a) present a question for resolution by the trier of fact.

ambiguous and the Legislature's intent is clear from the statutory language, the rule of lenity has no application here. *Id.*

## IV. FIRST AMENDMENT

Defendants contend that MCL 168.932(a) is unconstitutional on its face and as applied to defendants. We disagree. Rather, we conclude that MCL 168.932(a) is not void for vagueness, nor is it unconstitutional as applied to defendants because it criminalizes speech integral to criminal conduct.

A challenge to the constitutionality of a statute presents a question of law reviewed de novo on appeal. *GR*, 331 Mich App at 68. The statute is presumed to be constitutional unless its unconstitutionality is plainly apparent, and when possible, the statute is to be construed as constitutional. *Id.* "The burden is on the party challenging the statute's constitutionality to prove its invalidity." *Id.*

"Congress shall make no law . . . abridging the freedom of speech." US Const, Am I. The First Amendment, US Const, Am I, applies to the states through the Fourteenth Amendment, US Const, XIV. *J & J Constr Co v Bricklayers & Allied Craftsmen, Local 1*, 468 Mich 722, 729; 664 NW2d 728 (2003). The Michigan Constitution provides the same protection. Under Const 1963, art 1, § 5, "[e]very person may freely speak, write, express and publish his views on all subjects, being responsible for the abuse of such right; and no law shall be enacted to restrain or abridge the liberty of speech." "The rights of free speech under the Michigan and federal constitutions are coterminous." *In re Contempt of Dudzinski*, 257 Mich App 96, 100; 667 NW2d 68 (2003).

"The void for vagueness doctrine is derived from the constitutional guarantee that the state may not deprive a person of life, liberty, or property, without due process of law." *People v Lawhorn*, 320 Mich App 194, 198; 907 NW2d 832 (2017) (quotation marks and citation omitted). A statute may be deemed unconstitutionally vague for three reasons: "(1) it is overbroad and impinges on First Amendment freedoms; (2) it does not provide fair notice of the conduct proscribed; or (3) it is so indefinite that it confers unstructured and unlimited discretion on the trier of fact to determine whether an offense has been committed." *Id.* at 199 (quotation marks and citation omitted). Defendants submit that MCL 168.932(a) is void for vagueness because it does not adequately define "other corrupt means or devices."

"A statute provides fair notice when it give[s] a person of ordinary intelligence a reasonable opportunity to know what is prohibited." *People v Miller*, 326 Mich App 719, 738; 929 NW2d 821 (2019) (quotation marks and citation omitted; alteration in original). "Fair notice exists when the statute's meaning can be determined by referring to judicial interpretations, common law, dictionaries, treatises, or the common meaning of words." *Id.* As explained earlier, the key term in the challenged phrase—corrupt—has been interpreted by judicial opinions. "Corrupt behavior" refers to "intentional, purposeful, deliberate, and knowing wrongful behavior," *Waterstone*, 296 Mich App at 138, while "corrupt intent" means a "sense of depravity, perversion or taint," *Perkins*, 468 Mich at 456. A person of reasonable intelligence should therefore understand that he or she violates MCL 168.932(a) by using any intentional, purposeful, deliberate, and knowingly wrongful method with the depraved intent to interfere with voting.

-12-

Defendants also contend that the phrase "corrupt means or device" makes the statute overbroad because it criminalizes protected speech in a manner that is not narrowly tailored to fit a compelling governmental interest. Defendants characterize this argument as a facial challenge, but only present arguments regarding the breadth of the statute as applied specifically to the robocall message. "A facial challenge attacks the statute itself, and requires the challenger to establish that no set of circumstances exist under which the act would be valid. The fact that the . . . [a]ct might operate unconstitutionally under some conceivable set of circumstances is insufficient." *People v Johnson*, ___ Mich App ___, ___; ___ NW2d ___ (2021) (Docket No. 351308); slip op at 2 (quotation marks and citation omitted; alteration in original). "An as-applied challenge alleges a present infringement or denial of a specific right or of a particular injury in process of actual execution of government action." *Id*. (quotation marks and citation omitted). Because defendants focus on specific application of the statute to the facts at hand, we treat this issue as an as-applied challenge.

In *United States v Stevens*, 559 US 460, 470; 130 S Ct 1577; 176 L Ed 2d 435 (2010), the United States Supreme Court explained:

> The First Amendment's guarantee of free speech does not extend only to categories of speech that survive an ad hoc balancing of relative social costs and benefits. The First Amendment itself reflects a judgment by the American people that the benefits of its restrictions on the Government outweigh the costs. Our Constitution forecloses any attempt to revise that judgment simply on the basis that some speech is not worth it.

Consequently, the government may not ordinarily restrict speech on the basis of its content, except in a number of well-recognized areas. *United States v Alvarez*, 567 US 709, 716; 132 S Ct 2537; 183 L Ed 2d 574 (2012). "Among these categories are advocacy intended, and likely, to cite imminent lawless action; obscenity; defamation; speech integral to criminal conduct; so-called 'fighting words'; child pornography; fraud; true threats; and speech presenting some grave and imminent threat the government has the power to prevent . . . ." *Id*. at 717 (citations omitted). The parties here disagree as to whether the prohibition against using corrupt means or devices to interfere with voting falls within the exceptions for true threats or speech integral to criminal conduct.

We agree with defendants that MCL 168.932(a) operates in this case to bar speech beyond the scope of the true threat exception because it extends to threats of nonviolent harm.

> "True threats" encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. The speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats "protect[s] individuals from the fear of violence" and "from the disruption that fear engenders," in addition to protecting people "from the possibility that the threatened violence will occur." Intimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or

death. [*Virginia v Black*, 538 US 343, 359-360; 123 S Ct 1536; 155 L Ed 2d 535 (2003) (citations omitted; alteration in original).]

Relying on the Supreme Court's articulation of a true threat in *Black*, this Court has likewise stated that true threats involve threats of unlawful violence. *TM v MZ*, 326 Mich App 227, 239; 926 NW2d 900 (2018). The message disseminated by defendants warned of harm to the listener's freedom, financial security, and bodily autonomy, but did not involve a "serious expression of an intent to commit an act of unlawful violence . . . ." *Black*, 538 US at 359. MCL 168.932(a), therefore, cannot avoid constitutional scrutiny in this case under the true threat exception.[11]

However, we conclude that First Amendment protection exception for "speech integral to criminal conduct" is applicable. *Giboney v Empire Storage & Ice Co*, 336 US 490; 69 S Ct 684; 93 L Ed 2d 834 (1949), the authority commonly cited for this exception, involved an injunction against peaceful picketing at an ice distribution facility by members of an ice peddlers union. *Id*. at 491-492. The union members' goal was to compel the ice distributor to stop selling to nonunion peddlers, contrary to a state statute prohibiting participation in any "pool, trust, agreement, combination, confederation or understanding with any person or persons in restraint of trade or

---

[11] In reaching this conclusion we are mindful of the decisions rendered in *United States v Nguyen*, 673 F3d 1259 (CA 9, 2012), and *Nat'l Coalition on Black Civic Participation v Wohl*, 498 F Supp 3d 457 (SD NY, 2020). In *Nguyen*, the defendant, a Republican candidate for a seat in the United States House of Representatives, mailed a Spanish-language letter to registered voters with Hispanic surnames who were registered as Democrats or "decline[d] to state[]." He challenged his conviction for obstruction of justice for failing to disclose the full extent of his knowledge regarding the mailing of the letter that was designed to act as an attempt at voter intimidation. *Nguyen*, 673 F3d at 1261-1262. In addition to challenging the probable cause to issue a search warrant, defendant alleged that his letter was political speech entitled to First Amendment protection. The *Nguyen* Court rejected the First Amendment challenge, citing *Black*, 538 US at 360, and concluding that "[i]ntimidation in the constitutionally proscribable sense of the word is a type of true threat." However, the *Nguyen* Court never examined the additional aspect of *Black* that the statement communicate an intent to commit an act of unlawful violence to a particular individual or group. *Id*. at 1266. In *Nat'l Coalition*, the plaintiffs sued defendants, among others, for sending the same robocall at issue in the present case to minority populations in New York City in violation of the Voting Rights Act, 52 USC 10307(b), and requested injunctive relief. 498 F Supp 3d at 463-466. The *Nat'l Coalition* Court recognized the *Nguyen* decision as well as the *Black* Court's requirement that a threat to commit a violent act accompany a true threat. The *Nat'l Coalition* Court nonetheless granted the request for injunctive relief despite a First Amendment challenge noting that a nonviolent or illegal per se act may still constitute interference, intimidation or coercion for purposes of the Voting Rights Act. *Id*. at 477-485. Because Michigan has applied the threat of violence to the true threat exception to First Amendment protections, *TM*, 326 Mich App at 239, we do not conclude that *Nguyen* and *Nat'l Coalition* are dispositive. See MCR 7.215(J)(1) ("A panel of the Court of Appeals must follow the rule of law established by a prior published decision of the Court of Appeals issued on or after November 1, 1990, that has not been reversed or modified by the Supreme Court, or by a special panel of the Court of Appeals as provided in this rule.").

-14-

competition . . . ." *Id*. at 491 n 2, 492. Had the distributor agreed to stop selling ice to nonunion members, it too would have been in violation of the state antitrade restraint law. *Id*. at 493. The union peddlers argued, in part, that the injunction violated the First Amendment freedom of speech because they were merely publicizing truthful facts in a peaceful manner. *Id*. at 497-498. But the Supreme Court disagreed, reasoning that the "sole immediate object of the publicizing adjacent to the premises of [the distributor] . . . was to compel [the distributor] to agree to stop selling ice to nonunion peddlers," contrary to state law. *Id*. at 498. The Court concluded that freedom of speech did not "extend[] its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute." *Id*. "[I]t has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Id*. at 502.

Here, the purpose of MCL 168.932(a) is to preserve and protect the right to vote, a compelling state interest. See *Burson v Freeman*, 504 US 191, 198-199; 112 S Ct 1846; 119 L Ed 2d 5 (1992) (recognizing protection of right to vote freely as compelling state interest); *Mich Alliance for Retired Americans v Secretary of State*, 334 Mich App 238, 257; 964 NW2d 816 (2020) (noting the state's compelling interest in preserving the integrity of elections). The statute carries out this goal by prohibiting influencing, deterring, or interrupting an elector from giving his or her vote by way of bribery, menace, or other corrupt means or device. To the extent a fact-finder agrees with the prosecution's theory that defendants spread a dishonest message with the depraved intent to discourage voting, defendants' dissemination of the message deterred voting through corrupt means. Like the picketing in *Giboney*, the speech was an integral part of conduct criminalized by MCL 168.932(a) and should not be constitutionally protected merely because the conduct was "carried out by means of language." *Id*.

Affirmed.

/s/ Anica Letica
/s/ Michelle M. Rick